# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **LEONARD HARRIS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-cv-01202** |
| | ) | **Judge Campbell** |
| **STATE OF TENNESSEE and** | ) | |
| **J.R. MILLER, Warden,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## <u>M E M O R A N D U M</u>

## I.     INTRODUCTION AND BACKGROUND

The petitioner, Leonard Harris,[1] has filed a *pro se* petition for a writ of *habeas corpus* under 28 U.S.C. § 2254.  (Docket No. 1).  The petitioner is an inmate at the Charles Bass Correctional Complex in Nashville, Tennessee.  The petitioner challenges the legality of his confinement under a 2008 judgment of the Criminal Court for Davidson County, Tennessee, convicting him of attempted second degree murder.  *State of Tenn. v. Frederick Edward Braxton and Leonard Cardell Harris,*  No.   M2009-01735-CCA-R3-CD, 2011 WL 3809773 (Tenn. Crim. App. Aug. 20, 2011)(perm. app. denied Jan. 10, 2012); Addendum 1, Vol. 1, p. 70).   The trial court sentenced the defendant, who was a Range I offender, to a sentence of eleven years imprisonment.  (*Id.*)[2]

Harris appealed his conviction and sentence to the Tennessee Court of Criminal Appeals. (Docket No. 16, Attach. 4).  He raised claims of ineffective assistance of counsel on direct appeal.

---

[1]  Throughout this memorandum, Leonard Harris is referred to as "petitioner," "defendant," and "appellant" interchangeably.

[2]  The trial court sentenced Braxton, who was a Range II offender, to a sentence of nineteen years imprisonment. *Id.*

1

(*Id.*)  On August 26, 2011, the appellate court affirmed the petitioner's conviction and sentence. (Docket No. 16, Attach. 6).   Harris filed an application seeking discretionary review by the Tennessee Supreme Court, which the court denied on January 10, 2012.   (Docket No. 16, Attach. 8).

On December 19, 2011, Harris filed the instant petition.  (Docket No. 1).  In his petition, the petitioner asserts ineffective assistance of counsel claims.  The petitioner names J.R. Miller, the warden of the West Tennessee State Penitentiary, and the State of Tennessee as respondents.

Upon its receipt, the court conducted a preliminary examination of the petition and determined that the petitioner had stated a colorable claim for relief.  Accordingly, the court entered an order on January 6, 2012, directing the respondent to answer or otherwise respond to the petition. (Docket No. 8).  The respondent filed an answer/response urging the court to deny the petition and dismiss the action.  (Docket No. 14).  The petitioner has not filed a reply in opposition to the respondent's motion to dismiss.

Upon consideration of the record, the court concludes that an evidentiary hearing is not needed.  *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003)(an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief).  Therefore, the court shall dispose of the petition as the law and justice requires.  Rule 8(a), Rules — § 2254 Cases.

The petitioner has submitted a motion for appointment of counsel.  (Docket No. 5).   The Supreme Court has held that "an indigent's right to appointed counsel . . . exists only where the litigant may lose his physical liberty if he loses the litigation."  *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 25 (1981).  Thus, unlike criminal proceedings, there is no constitutional right to an

appointed counsel in a civil action. *Willett v. Wells*, 469 F. Supp. 748, 751 (E.D. Tenn. 1977), *aff'd*, 595 F.2d 1227 (6th Cir. 1979); *see Williamson v. Autorama, Inc.,* No. 91-5759, 947 F.2d 947 (6th Cir. 1991)(citing *Willett* favorably).

The appointment of counsel for a civil litigant is a matter within the discretion of the district court and will occur only under exceptional circumstances. *Lavado v. Keohane*, 992 F.2d 601, 604-05 (6th Cir. 1993). The petitioner's circumstances, however, are typical to most prisoners and do not suggest anything exceptional in nature. Therefore, the petitioner's motion for the appointment of counsel will be denied.

Jurisdiction and venue in this court are appropriate under 28 U.S.C. § 2241(d) because the petitioner was convicted in the Criminal Court for Davidson County in Nashville, Tennessee.

## II.    SUMMARY OF THE EVIDENCE

The facts underlying Harris's conviction were recounted in the opinion of the Tennessee Court of Criminal Appeals in the petitioner's direct appeal as follows:

> **State's Proof**
> On February 15, 2006, the victim, James Williams, was working at East Nashville Auto Sales located at 1413 Dickerson Pike. On that day, he noticed a car traveling down the street with "one of the defendants' brother in it." The victim did not think anything about it and continued "what [he] was doing at the time." He left work around 5:00 p.m. and drove toward downtown Nashville on Dickerson Pike, a four-lane road, to pick up his girlfriend. As he was driving in the left lane, the victim noticed "a green early nineties model—uh—Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim testified that he closed his sunroof "thinking that if [he] shut the sun roof the car would be dark and they wouldn't know who was in it, that they wouldn't open no fire on the car." He then moved into the right lane of Dickerson Pike in an attempt to get to the interstate and lose the other vehicle. The victim testified that when he stopped in traffic, the green car pulled up beside him with "two men hanging out the car shooting." He recognized the two men

as Defendant Braxton and Defendant Harris whom he had known since the early 1990's, and their relationship was one of "bad blood." Although there were four people in the vehicle, the victim could not identify the other two. He said that Defendant Harris was in the front and Defendant Braxton was in the back. Both men were on the passenger's side of the car.

Upon realizing that he had been shot, the victim played dead and after the Defendants left, he drove to the AM / PM Market on North First Street and asked a lady there to call 9–1–1. He testified that he had been carrying a .40 caliber handgun at the time of the shooting that he tossed in a trash can before entering the market. The victim was then transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. The victim testified that one of the bullets struck him in the upper arm. He said:

> It went through the back and came out there. They had to put a metal plate right here ... straight through in and out right here. It went through my—one bullet went through my hand and lodged in my wrist, one in my finger and one in my mouth. And, it knocked my teeth out.

The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose. He said that he lost six teeth, and there were sixteen bullet holes in his car as a result of the shooting.

The victim testified that he received a visit from Detective Bradley at the hospital shortly after coming out of surgery, and he told Detective Bradley that he did not want to talk about what happened. The victim said that he intended to handle the situation himself but changed his mind after speaking with his mother who told him to think of his family and the pain that he would cause them by taking matters into his own hands. The victim testified that he spoke with Detective Bradley a second time and told him that Defendants Braxton and Harris shot him. Detective Bradley later returned to the hospital with photographic lineups, and the victim identified each Defendant. The victim admitted that he had previously been convicted of several criminal offenses. He further admitted that because he was a convicted felon, he broke the law by possessing the 40–caliber handgun at the time of the shooting.

The victim testified that after one particular court appearance on

4

August 18, 2006, he saw Defendant Harris outside the courthouse. He made eye contact with Defendant Harris who said, "I'm gonna get you boy. So, be ready." He said that Defendant Harris then walked down the drive talking to his family and making gun-like gestures.

On an occasion prior to the shooting which is the subject of this case, the victim testified that in October of 2005, he arrived home around 1:30 or 2:00 a.m., and as he was walking through the breezeway to his residence, Defendant Harris and another individual opened fire on him. One of the bullets struck him in the foot. The victim testified that he shot at a third man who ran from the side of the building. He then hid under a neighbor's Jeep until Defendant Harris and the other men left. The victim testified that his sister called police, and when they arrived, he told them that everything was fine and that he would "handle it." He also told police that he did not know who shot at him. He said that he did not want police searching his house because he had two firearms on his person, and there were additional assault rifles in his home. The victim testified that he had driven by Defendant Harris' beauty shop prior to the incident.

Kenneth Miller testified that he left work on February 15, 2006, and dropped a passenger off at Dunlap and Kyle Tire on Dickerson Road. As he was sitting at a traffic light, he heard gunshots nearby. Mr. Miller testified that he "located two cars in [his] side mirror going in the opposite direction. The one car pulled up next to the other car and-uh -they started firing again." He further testified:

> Uh—when they fired again, I was watching in—in my side mirror. Uh—and, uh—I saw—uh—either a black sleeve, or a black arm, holding a black semi-automatic. I personally own a Tarurus (phonetic) [sic] nine [millimeter]. And, it had the same style and size as that. And, I could—I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces of that car were just exploding.

Mr. Miller stated that he saw the arm protruding out of the passenger's side of the car. He then drove a short distance and called police. He was assured that officers were on the scene, and he drove back and talked to an officer there. Mr. Miller testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again." He said that when the shooting "started, it started." Mr. Miller did not know the model of the car involved in the

shooting. He said that it was a "sedan-type" vehicle.

Detective Michael Wilson of the Metropolitan–Nashville Police Department testified that he was working as a patrolman assigned to the East Precinct Crime Suppression Unit on February 15, 2006. He and Officer Jason Smith were standing on Joseph Avenue and Evanston late that afternoon and heard multiple gunshots. It sounded as though two different weapons were fired, and he could tell that the shots came from the Dickerson Road area. Detective Wilson and Officer Smith got into their cars and drove south on Dickerson Road to Cleveland Street. Detective Wilson testified that he pulled into the parking lot of the AM/PM Market and saw a small car parked in front of the gas pumps with blood inside it and twelve to fifteen bullet holes in the car on the driver's side. He walked inside the market and saw the victim, who was bleeding. One of the bullets had knocked out the victim's front teeth. Detective Wilson was unable to get much information from the victim before he was taken away by ambulance due to the trauma to his mouth.

Belba Wilson, the victim's mother, testified that she went to Vanderbilt Medical Center on February 15 or 16, 2006, to see the victim. She did not remember if the victim said who shot him, but he was talking about retaliation. Ms. Wilson told him to think of his kids and not take matters into his own hands.

Officer Woodrow Ledford testified that he responded to the shooting on Dickerson Road. He drove to the AM/PM Market and was then instructed to move further up Dickerson Road around Dunlap and Kyle Tire to look for evidence. The area had businesses along the entire street, and there were several parking lots. Because he was there around 5:00 p.m., the area was "fairly congested" with traffic. Officer Ledford testified that the area had two northbound and two southbound lanes, was two to three miles from downtown Nashville, and was heavily populated. He said that there was not an actual entrance ramp to the interstate from Dickerson Road, but it could be accessed from Spring Street.

Officer Ledford testified that when he pulled into the parking lot of Dunlap and Kyle Tire, a gentleman handed him "12 or so" spent shell casings that he had picked up. There was also a mirror from a vehicle. Officer Ledford also picked up five or six shell casings himself. He believed some of the casings were 40–caliber and some were smaller and appeared to be nine-millimeter. Officer Ledford gave the shell casings to another officer.

Officer Tommy Simpkins of the Metropolitan–Nashville Police Department, Identification Section, testified that he was dispatched to the AM/PM Market on February 15, 2006, and viewed a black, four-door Toyota Corolla. There were several bullet strikes in the vehicle, and he saw some projectile and projectile pieces. Officer Simpkins testified that there were no shell casings inside the Corolla. The windows were up and for the most part remained intact. There were holes on the front driver's door window and the rear driver's side window, and a bullet was found in the door frame of the driver's side. Officer Simpkins collected the victim's clothing, and a "slug" was retrieved from the trunk. He also found a tooth from the victim on the ground outside of the car. Officer Simpkins testified that he was given twelve spent shell casings by Officer Ledford. Seven of the casings were forty-caliber and five were nine-millimeter.

Detective Terrence Bradley testified that paramedics were treating the victim when he arrived at the AM/PM Market, and he followed the ambulance to the hospital. He spoke briefly with the victim who gave him a description of what happened. Detective Bradley testified that the victim gave him the names of Defendant Braxton and Defendant Harris. He said that the victim was in a lot of pain and did not want to talk any more. Detective Bradley then put together a photographic line-up and showed it to the victim at the hospital. The victim identified Defendant Braxton, but could not write because his hands were immobilized. At that time, Detective Bradley had not located anything on Defendant Harris. He later found Defendant Harris in the system and put together another line-up. The victim identified Defendant Harris. Detective Bradley then obtained warrants on Defendants Harris and Braxton.

On cross-examination, Detective Bradley testified that he did not recall asking the victim who shot him while he and the victim were at the market. He said that he stopped talking to the victim at the hospital because the victim became uncomfortable. He did not remember the victim saying that he wanted to take care of things himself, and he probably saw the victim three times at the hospital.

**Defendant Harris' Proof**
Willie Sweat, Defendant Harris' step-son, testified that he was living with his mother and Defendant on February 15, 2006. He said that he arrived home from school around 3:30 p.m. and saw Defendant Harris in the restroom vomiting. Mr. Sweat then walked into his room and shut the door. He said that Defendant was at the house all night.

Mr. Sweat testified that he could remember the date because it was the day after Valentine's Day, and they had all gone to Chili's to eat with a large group of people.

On cross-examination, Mr. Sweat testified that Defendant Harris was wearing a sleeveless t-shirt and underwear at the time. He said that his mother arrived home around 4:00 or 5:00 p.m. Mr. Sweat testified that he ate supper in his room, but saw Defendant Harris get some soup. He had no idea what time it was. Mr. Sweat admitted that he did not testify on Defendant Harris' behalf at the preliminary hearing. He further admitted that he had never told police or anyone at the district attorney's office that Defendant Harris was at home at the time of the shooting.

Pamela Sweat Harris testified that she was working on February 15, 2006, and arrived home by 4:30 p.m. She said that Defendant Harris walked out of the kitchen complaining that his stomach was hurting, and he told her that he had been vomiting. Ms. Harris testified that Defendant Harris took some medication and walked upstairs. She said that he was at home all night. Ms. Harris testified that she remembered the date because they had gone to Chili's on Valentine's Day with a large group of people.

On cross-examination, Ms. Harris testified that Defendant Harris was wearing a long t-shirt with short sleeves and jeans when she got home. She said that she did not know when Defendant Harris was arrested, and she did not know when the preliminary hearing was held. She also did not help him obtain legal counsel. Ms. Harris testified that she did not speak with Defendant Harris' attorney before the preliminary hearing; however, she thought that she told him at some point that Defendant Harris was at home with her at the time of the shooting.

**Defendant Braxton's Proof**
Derrica Christman testified that she was living in the Parkway Terrace Apartments in February of 2006. She met Defendant Braxton in the summer of 2005, and he frequently hung around the apartment complex. Ms. Christman testified that she remembered February 15, 2006, because it was the day after Valentine's Day, and her daughter had attended a dance at Stratford High School. Her daughter only attended Stratford for one year. Ms. Christman testified that her daughter was going to ask Defendant Braxton for a ride to the dance, but Ms. Christman's brother took her instead. She said that the following day, February 15, Defendant Braxton asked how the dance

went.

Ms. Christman testified that she saw Defendant Braxton and several others shooting dice near her back porch "no later than" 5:15 on February 15, 2006. She was certain of the time because her children usually arrived home from daycare between 5:15 and 6:00 p.m ., and she had to go out and get them off the bus.

On cross-examination, Ms. Christman testified that four or five people usually played dice at her back porch, and Defendant Braxton was frequently there. She said that she and Defendant Braxton had a conversation about her daughter's dance on February 15, 2006, and she saw him on February 13 and 14, but not February 11 and 12. Ms. Christman testified that she also saw Defendant Braxton on February 5 and 6, 2006, and she remembered seeing him in the area around her home on February 5. Ms. Christman said that she did not learn of the shooting until April of 2006 when she was trying to find out why Defendant Braxton was in jail. At the time, she did not tell police or anyone at the district attorney general's office that they had the wrong person. She said that she came forward in October of 2006 after speaking with Defendant Braxton. Ms. Christman acknowledged that her apartment was located near the 700 to 800 block of Dickerson Road.

**State's Rebuttal Proof**
On rebuttal, Derrica Christman was recalled as a witness. She testified that if February 6, 2006, was a weekday, she saw Defendant Braxton after 5:00 p.m. She also saw him on February 13, 2006, between 5:00 and 5:15 walking from the building next door to hers. He was wearing the same jacket that she saw him wearing on February 15, 2006. On cross-examination, Ms. Christman said that she last saw Defendant Braxton eight days before February 13, 2006, and she was not sure that she saw him on February 6, 2006. She was certain that she saw him on February 13, 2006.

Wayne Miller, Records Technician for the Davidson County Sheriff's Office, testified that Defendant Braxton was in the custody of Sheriff's Office during February of 2006. He entered the facility at 2:12 p.m. on February 6, 2006, and he left at 4:27 p.m. on February 13, 2006.

Alfred Gray, an investigator for the district attorney general's office, testified that he spoke with Ms. Christman concerning Defendant Braxton's case. Ms. Christman told him that she remembered

Defendant Braxton being outside of her home on the night of the shooting. She remembered the incident because it happened the day after Valentine's Day, and Defendant Braxton had been released from jail the day before Valentine's Day. Ms. Christman did not mention anything about her daughter's dance. Investigator Gray indicated that Ms. Christman's residence at Parkway Terrace was located a little less than two miles from the intersection of Grace and Dickerson Road where the shooting took place.

*State v. Braxton,* 2011 WL 3809773, **1-6 (Tenn. Crim. App. Aug. 20, 2011).

## III.  STANDARD

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act

of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996),  provides the following with respect

to granting a writ of *habeas corpus* to prisoners who are in custody pursuant to a state court

judgment:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*

Where state courts have made factual determinations regarding issues presented for federal

*habeas corpus* review, such determinations are presumed to be correct, and the petitioner has the

burden of rebutting that presumption of correctness by clear and convincing evidence.  28 U.S.C.

§ 2254(e)(1).  The purpose of federal *habeas corpus* review is to "ensure that state court convictions

are given effect to the extent possible under the law," not to conduct a federal re-trial. *Bell v. Cone,*

535 U.S. 685, 693 (2002).

## A.    Ineffective Assistance of Counsel Claims

The petitioner alleges two instances of ineffective assistance of counsel.[3]  (Docket No. 1 at pp. 1-2).  First, the petitioner alleges that his attorney failed to instruct the jury as to the lesser included offense of misdemeanor reckless endangerment.  (Docket No. 1 at p. 1, Docket No. at pp. 1-17).   Second, the petitioner alleges that his attorney was ineffective when he asked the victim about prior altercations with the petitioner. (Docket No. 1 at p. 2, Docket No. 2 at pp. 18-24).  The court will address each argument in turn.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant.  *See Bell v.  Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness.   *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000).   In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690-91.   Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams,* 367 F.3d 562, 570

---

[3]  Although the petitioner sets forth four grounds for relief (Docket No. 1 at pp. 1-2), the substance of his argument is that his trial counsel was deficient in two instances. Those two instances  are the focus of the court's analysis.

(6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland,* 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)(*en banc*)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed below, this court cannot conclude that the state court's rejection of the petitioner's ineffective assistance claims involved an unreasonable determination of the laws in light of the evidence presented during the state court proceedings, or that the state court's decision was contrary to, or involved an unreasonable application of, the standard established by *Strickland*. 28 U.S.C. § 2254(d).

**1.    Whether counsel was ineffective in failing to object to the trial court's failure to instruct the jury as to the lesser included offense of misdemeanor reckless endangerment**

Defendant Harris was charged with attempted premeditated first degree murder. (Docket No.

15, Attach. 1 at p. 2). After the presentation of evidence, during a charge conference outside the presence of the jury, the trial court suggested instructions on

> the indicted offense, attempted first, which would also include attempted second, attempted voluntary manslaughter. There could be, I guess, some . . . argument, and it is a lesser included offense of facilitating those listed offenses, facilitating attempted first, facilitating second, and facilitating voluntary manslaughter and, then, aggravated assault with a deadly weapon and aggravated assault with serious bodily injury.

(Docket No. 15, Attach. 7 at pp. 445-46). The defendant's counsel did not request instructions on any other lesser included offenses. When asked at the motion for new trial why he did not request a jury instruction on misdemeanor reckless endangerment, trial counsel testified under oath that he was satisfied with the instructions the court had given. (Docket No. 16, Attach. 2 at p. 13).

In the charge given to the jury before deliberations, the trial court instructed the jury on the offense of attempted first degree premeditated murder and the lesser included offenses of facilitation of attempted first degree murder, attempted second degree murder, facilitation of attempted second degree murder, attempted voluntary manslaughter, facilitation of attempted voluntary manslaughter, aggravated assault with a deadly weapon, and aggravated assault with serious bodily injury. (Trial Record Volume XI, pp. 5, 9-21). The court instructed the jury as to the proper consideration of the various offenses:

> When you begin your deliberations on the Indictment, you must first deliberate on the indicted or charged offense. If you find the Defendant guilty of the indicted offense, you may stop your deliberations as to the remaining charges within that count of the indictment.
> If you find the Defendant not guilty of the indicted offense or you have a reasonable doubt, then you must find the Defendant not guilty of that indicted offense and next consider the lesser-included offenses as set out in your Verdict Form.
> You must first deliberate on the greater offense and reach a verdict

13

> as to the greater offense, before you move on to the next lesser-included offense.
>
> If you reach a verdict as to the guilt of the Defendant as to a greater offense, you may stop your deliberations as to that specific count.

(Trial Record Volume XI, pp. 21-22).

The petitioner asserts that trial counsel should have objected to the trial court's failure to instruct the jury as to the lesser included offense of misdemeanor reckless endangerment. (Docket No. 1 at p. 1). The petitioner raised this claim of ineffective assistance of counsel on direct appeal of his conviction and sentence. (Docket No. 16, Attach. 4). However, the Tennessee Court of Criminal Appeals determined that the petitioner had failed to demonstrate that counsel's representation was ineffective. (Docket No. 16, Attach. 6). Citing *Strickland v. Washington*, 466 U.S. 688 (1984), the appellate court explained:

> ### A. Failure to Request a Jury Instruction on the Lesser–Included Offense of Reckless Endangerment.
>
> Defendant Braxton and Defendant Harris both contend that their respective trial counsel was ineffective for failing to request a jury instruction on the misdemeanor offense of reckless endangerment as a lesser-included offense of attempted premeditated first degree murder.
>
> Initially, we note that each Defendant has the burden of proving that he or she was prejudiced by an alleged deficiency on the part of trial or appellate counsel. *Strickland,* 466 U.S. at 687, 104 S .Ct. 2052, 80 L.Ed.2d 674. In order to establish prejudice, each Defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* 466 U.S. at 694. A defendant is required to request in writing that the trial court instruct the jury on any specifically identified lesser included offense. T.C.A. § 40–18–110(a). In the absence of such a request, the trial court may charge the identified lesser included offense, but the defendant is not entitled to the charge. *Id.* § 40–18–110(b). Reckless endangerment is a lesser included offense of attempted first degree murder. *See State v. Rush,* 50 S.W.3d 424, 431–32 (Tenn.2001). If it had been included

in the jury charge, it would have been listed *after* aggravated assault.

In this case, Defendants were indicted for the offense of attempted first degree murder. The trial court instructed the jury on the indicted offense and the lesser included offenses of facilitation of attempted first degree murder, attempted second degree murder, facilitation of attempted second degree murder, attempted voluntary manslaughter, facilitation of attempted voluntary manslaughter, aggravated assault with a deadly weapon, and aggravated assault with serious bodily injury. The jury convicted Defendants of attempted second degree murder to the exclusion of the immediate lesser included offenses. Harmless error may be shown where the jury convicts on the higher offense to the exclusion of the immediately lesser offense, necessarily rejecting other lesser offenses. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn.1998). Therefore, we conclude that Defendants were not prejudiced by trial counsels' failure to request jury instruction on the lesser included offense of reckless endangerment.

*State v. Braxton,* 2011 WL 3809773, at **18-19 (Tenn. Crim. App. Aug. 20, 2011).

Even if trial counsel should have requested the lesser included offense of misdemeanor reckless endangerment, the court finds that, considering the facts presented, the state court's determination that the petitioner was not prejudiced by counsel's failure is reasonable.

As noted by the state appellate court, the jury did not convict on the charged offense of attempted first degree murder. Instead, the jury convicted the defendant of attempted second degree murder. The jury did so even though the trial court additionally charged <u>other</u> lesser included offenses. Thus, the state court reasonably could have determined that, by finding the defendant guilty of attempted second degree murder--in lieu of the lesser offenses of facilitation of attempted first degree murder, facilitation of attempted second degree murder, attempted voluntary manslaughter, facilitation of attempted voluntary manslaughter, aggravated assault with a deadly weapon, and aggravated assault with serious bodily injury-- the jury necessarily weighed the evidence and determined that the offense of attempted second degree murder was the most

appropriate charge supported by the evidence.

The petitioner alleges that, had trial counsel asked the trial court to instruct on misdemeanor reckless endangerment, the jury could have deliberated and returned a verdict on misdemeanor reckless endangerment, thus the defendant would have faced significantly less time. However, the state court reasonably could have determined that, even if the jury had received instructions on the offense of misdemeanor reckless endangerment, the jury's verdict would have been the same. The jury was instructed to consider each lesser included offense in order and to cease deliberations when it reached a guilty verdict as to an offense. The jury's verdict of guilty on the greater offense of attempted second degree murder, which requires a "knowing" state of mind, and its rejection of the lesser included offenses of attempted voluntary manslaughter and aggravated assault demonstrates that it is highly unlikely the jury would have returned a verdict of guilty on misdemeanor reckless endangerment, which requires only a "reckless" state of mind. *See State v. Williams,* 977 S.W.2d 101, 106 (Tenn. 1998)(holding that trial court's failure to instruct on voluntary manslaughter constituted harmless error, where jury was instructed as to lesser included offense of second degree murder and convicted the defendant of first degree premeditated murder; jury necessarily rejected all other lesser offenses, including voluntary manslaughter); *State v. Boyd*, 797 S.W.2d 589, 593 (Tenn. 1990)(holding that any possible error in failing to instruct voluntary and involuntary manslaughter, when second degree murder was charged and the defendant was convicted of first degree murder, was "completely harmless").

The jury's verdict thus demonstrates that the defendant suffered no prejudice from the trial court's failure to charge the lesser included offense of misdemeanor reckless endangerment. *See State v. Williams,* 977 S.W.2d 101, 105 ("Reversal is required if the error affirmatively appears to

have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice."); *see also State v. Ely*, 48 S.W.3d at 727 (refining *Williams* to hold that "the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt."); *State v. Richmond*, No. M2000-015450CCA-R3-CD (Tenn. Crim. App. Oct. 15, 2001)(stating that "the only time a failure to instruct on lesser-included offenses can be considered harmless beyond a reasonable doubt is in the situation presented by the *Williams* case, i.e., where the jury by rejecting a verdict of guilt on an intermediate lesser-included offense for which they were instructed, in favor of a verdict on a more serious offense, 'necessarily' rejects all other lesser-included offenses.")(Smith, J., concurring and dissenting); *State v. Coleman,* No. M2000-01916-CCA-R3-CD, 2002 WL 125694, at *11 (Tenn. Crim App. Jan. 31, 2002)(finding that it was harmless error beyond a reasonable doubt where trial court failed to instruct on lesser included offenses and the jury convicted the defendant of highest offense with which he was charged; the evidence was sufficient to support the jury's verdict and "it is difficult to imagine how the failure to instruct on reckless or negligent homicide had any possible effect on the verdict.").

Because the state court's adjudication of the petitioner's claim was not an unreasonable application of clearly established federal law or based upon an unreasonable determination of the facts in light of the evidence before the state court, the court finds that Harris is not entitled to relief on this ground.

### 2.      No Certificate of Appealability shall issue as to the petitioner's first ineffective assistance of counsel claim.

When the district court denies a ground for relief on the merits in a *habeas corpus* action, a certificate of appealability "may issue . . . only if the applicant has made a substantial showing of

the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because the petitioner has not made a substantial showing of a constitutional right, a certificate of appealability will not issue with respect to the petitioner's ineffective assistance of counsel claim based on counsel's failure to request a jury instruction on the lesser included offense of reckless endangerment.

### 3. Whether trial counsel was ineffective in asking the victim about any prior altercations with the petitioner

Next, the petitioner alleges that trial counsel was ineffective when he asked the victim about any prior altercations with the petitioner, which "opened the door" for the jury to consider evidence of other misconduct by Harris not related to the facts of the current case. (Docket No. 1 at p. 2). The petitioner raised this issue on direct appeal of his conviction and sentence. (Docket No. 16, Attach. 4). However, the Tennessee Court of Criminal Appeals determined that the petitioner was not entitled to relief on this ground, explaining:

> ### F. Opening the Door to the Victim's Testimony About an Earlier Attempt by Defendant Harris to Harm or Kill the Victim.
>
> Defendant Harris argues that his trial counsel rendered deficient performance by asking the victim about a prior altercation with Defendant Harris that "opened the door" to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim. At trial, the victim testified concerning the events surrounding the shooting on February 15, 2006. On cross-examination, trial counsel asked the victim about the shooting and questioned him about his prior testimony at the preliminary hearing where the victim indicated that he had no other altercations with Defendant Harris. After being cautioned by the court, trial counsel ultimately asked the victim, "Have you had any other altercations with Mr. Harris" to which the victim replied, "That's correct." Trial counsel then impeached the victim by pointing to the record of the preliminary hearing in which the victim indicated that had not had other

altercations with Defendant Harris.

The State then sought to question the victim about a previous altercation during which Defendant Harris allegedly shot the victim in the foot. After a lengthy discussion out of the jury's presence, the trial court determined that the State would be allowed to question the victim about the prior altercation. On redirect examination, the victim testified that one night in October of 2005, someone had been following him. He said:

> I was—uh—headed down Gallatin road going to McDonald's to get me something to eat. And, I rolled (phonetic) Mr. Harris, beauty shop, barber shop, whatever it was at the time, and—uh—I just noticed a car get behind me. I turned, the car turned. And, I not gonna say it was a chase, but, the car stayed pretty much behind me where I had to speed up to lose the car. And, I finally side [sic] on a side street. And, I jumped out of the car and jumped in the bushes.

The victim testified that two cars "kept circling the block," and he called a couple of friends to pick him up. He stayed at their house for a few hours and then drove home around 12:45 a.m. The victim testified that he parked his car like he did every night. He then "checked the bushes", and as he walked up the breezeway, Defendant Harris and another individual opened fire on him. The victim said that although he had two handguns on him, he did not have a chance to return fire. He then realized that he had been shot in the foot. The victim testified that there was a third person "who ran on the side of the building and me and him exchanged gun-fire." He then hid under a neighbor's jeep until the three men left.

The victim testified that one of the neighbors called police, and when they arrived, he did not tell them that he saw Defendant Harris or the other two individuals. He explained that he did not want to talk to police because he had two firearms on him, as well as several assault rifles in his home, and he did not want them to search his home.

Concerning this issue, the trial court held:

As to the defendant's allegations that trial counsel was ineffective in opening the door to a prior unproven altercation, the Court notes that trial counsel did ask this question. Before the witness could answer the question, "Have you had any other altercations with Mr. Harris," the Court asked counsel if he wanted to ask that question. Trial counsel said that he did wish to ask the question and the Court permitted him. Although the question opened the ability to question about other incidents in order to fill the conceptual void as to the bad blood between the defendant and the victim, much of this information was admissible if brought out by the State. This information also allowed information about the complaining witness and possible unfavorable demeanor seen by the jury. Even though potentially prejudicial, this was a tactical decision by trial counsel that may have had a valid defense motivation but certainly does not rise to the necessary level of effecting the outcome of the trial.

The record supports the trial court's findings. Trial counsel was able to successfully impeach the victim's testimony at the preliminary hearing where he testified that he had no prior alterations with Defendant Harris. Furthermore, as pointed out by the State, the victim's testimony had no corroboration from any other witness, and the victim admitted that he was in possession of two guns during the shooting, and there were additional assault rifles in the house. When police arrived on the scene, the victim did not tell them who shot at him because he did not want his own criminal activities discovered. Defendant Harris has not shown that he was prejudiced by trial counsel's performance in this area. The proof presented at trial was sufficient to support Defendant Harris's conviction for attempted second degree murder. This issue is without merit.

*State v. Braxton,* 2011 WL 3809773, at **22-23 (Tenn. Crim. App. Aug. 20, 2011).

Additional background information is helpful here. During defendant Harris's trial, the State filed a Notice of Intent to Use Prior Bad Acts under Rule 404(b). (Trial Record Volume I, pp. 16-19). The State sought to introduce testimony that the victim, Williams, allegedly was shot at during a prior altercation with defendant Harris on October 6, 2005. (*Id.*) The State agreed to strike that

Notice prior to trial. At trial, Williams testified about the events surrounding the shooting of February 15, 2006. (Trial Record Volume IV, pp. 97-128). On cross-examination, defendant Harris's attorney questioned Williams about the shooting. (IV, pp. 131-40). Defense counsel then asked Williams if he had any prior altercations with the defendant. Williams stated that he had had previous dealings with the defendant but, at the preliminary hearing in August 2006, Williams had testified that he had no prior dealings with defendant Harris. (Trial Exhibit, Volume IV, pp. 156-62). Defense counsel then impeached Williams by pointing to the record of the preliminary hearing and noting that, on that day, Williams had answered no. (IV, p. 161). The trial court then ruled that testimony pertaining to the alleged prior altercation between Harris and Williams was admissible as Rule 404(b) evidence as to motive, intent, and identity. (Trial Exhibit, Volume IV, pp. 200-08). On re-direct examination, Williams then testified about a prior altercation in October 2005 when defendant Harris allegedly shot Williams in the foot. (V, pp. 212-22).

As the state court noted in evaluating the petitioner's ineffective assistance claim, defense counsel's decision to ask Williams about the prior shooting (and thereby "opening the door" to the admission of the Rule 404(b) evidence) was a strategic decision. Even after being prompted by the trial judge to reconsider whether he wanted to ask the question, defense counsel pressed onward, having made the decision that impeaching Williams's credibility was worth the risk of the jury hearing propensity or Rule 404(b) evidence. Although the petitioner disagrees with trial counsel's decision, counsel's tactical decisions are particularly difficult to attack. *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). Indeed, strategic choices by defense counsel are "virtually unchallengeable." *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001); *see also United States v. Stotts*, 2002 WL 1477214, at *5 (W.D. Tenn. July 2, 2002)("[t]he choice of a defense strategy [i]s

inherently tactical and not subject to review.").

*Strickland* requires that the petitioner must overcome the presumption that, under the circumstances, counsel's challenged action "might be considered sound trial strategy." 466 U.S. 689. The strategy "need not be particularly intelligent or even one most lawyers would adopt, but it must be within the range of logical choices an ordinarily competent attorney handling a . . . case would assess as reasonable to achieve a 'specific goal.'" *Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001), *rev'd on other grounds*, 535 U.S. 686 (2002).

Although not a decision that all defense attorneys would have made under the same circumstances, defense counsel's decision to ask questions that ultimately opened the door to the Rule 404(b) evidence was "within the range of logical choices" designed "to achieve a 'specific goal.'" *Id*. Defense counsel's specific goals were to impeach Williams's credibility by pointing out inconsistencies in his preliminary hearing and trial testimony and by forcing Williams to admit to being a convicted felon and that he did not pursue any legal action against Harris because of Williams's own criminal activities. The state court's determination that counsel's strategy was within the range of professionally reasonable judgments was reasonable. The petitioner has not overcome the presumption that his attorney's decision was sound trial strategy. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense lawyers would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

Importantly, any deficiency by trial counsel in opening the door concerning the alleged prior altercation between the victim and the defendant did not prejudice the petitioner, so as to support an ineffective assistance of counsel claim, in light of the fact that this evidence was neither the

strongest evidence nor the only evidence of the petitioner's guilt of the charged offense.

In sum, the court finds that the petitioner has failed to establish that the state appellate court's decision rejecting his claim of ineffective of assistance of counsel based on counsel's questioning the victim about the prior altercation is unreasonable so as to justify federal *habeas corpus* relief.

> **4.    No Certificate of Appealability shall issue as to the petitioner's second ineffective assistance of counsel claim.**

When the district court denies a ground for relief on the merits in a *habeas corpus* action, a certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing of a constitutional right, a certificate of appealability will not issue with respect to the petitioner's ineffective assistance of counsel claim based on trial counsel questioning the victim about any prior altercations with the petitioner.

## IV.    Conclusion

Accordingly, on all grounds, the petition will be **DENIED**.   Rule 4, Rules - - - § 2254 Cases.  The petitioner's claims will be **DISMISSED** with prejudice, and a certificate of appealability will not issue as to any of those claims.   The petitioner's motion to appoint counsel (Docket No. 5) will be denied.

An appropriate order will enter.

Todd J. Campbell
United States District Judge

23